**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Design Trend International Interiors, Ltd., an Arizona corporation,<br><br>Appellant,<br><br>vs.<br><br>Cathay Enterprises, Inc., an Arizona corporation,<br><br>Appellee. | No. CV10-01079-PHX-NVW<br><br>**ORDER** |

Appellant Design Trend International Interiors, Ltd., has appealed a final judgment entered in an adversary proceeding adjudicated by the United States Bankruptcy Court for the District of Arizona. The bankruptcy court concluded, after a trial, that Appellee Cathay Enterprises, Inc., was excused from further obligations under its contract with Design Trend because Design Trend had materially breached that contract. The result of the bankruptcy court's conclusion is that Cathay received the full benefit of Design Trend's services but only had to pay a fraction of what it agreed to pay under the contract. The Court has received full briefing and heard oral argument on March 24, 2011. For the reasons stated below, this Court reverses the bankruptcy court's final judgment.

**I.     Background & Procedural History**

**A.     The Hotel Renovation Project**

At all times relevant to this case, Cathay owned a hotel in Tempe, Arizona. In August 2000, Cathay contracted with Candlewood Hotel Company to become a Cambridge Suites franchisee, requiring Cathay to remodel and renovate its hotel to meet Candlewood's standards for Cambridge Suites. Cathay hired Design Trend, a contractor, to perform that work, which began in the fall of 2000.

Cathay and Design Trend operated without a written agreement for several months. Cathay asserts that, during this period, it paid Design Trend on a cost-plus basis. Then, Design Trend used a standard form a standard form contract published by the American Institute of Architects (AIA) to develop a written agreement. The AIA contract, which Design Trend dated January 23, 2001, contained a complete schedule of work with a grand total price of $1,308,681.29, plus "Arizona state remodel sales tax" at a rate of 4.875%, or $63,798.21. (Cathay Tr. 58, 79.)  The contract provided that "[t]he Contractor shall pay sales . . . taxes which are legally enacted when bids are received or negotiations concluded." (*Id.* 65.)

Cathay's representative signed this contract on March 14, 2001, but crossed out the total price of $1,308,681.29 and wrote in $1,277,000 — a change initialed by both Design Trend's and Cathay's respective representatives. (*Id.* 59.) The parties' contract contained a "time is of the essence" clause and required completion by June 8, 2001. Cathay claims that, "[i]ndeed, time was of the essence" because it "needed to have the hotel completed in time for the upcoming football season in order to accommodate ASU football fans who historically brought a lot of business to the hotel. [Cathay] was also desperate to get the construction completed for the upcoming ASU parent weekend." (Cathay Br. at 3, Doc. 23 at 8.) Cathay further claims that it informed Design Trend of these upcoming business opportunities. (*Id.*; *see also id.* at 21, Doc. 23 at 26.) Nonetheless, the contract contained a waiver of consequential damages, specifically including damages "for rental expenses, for losses of use, income, [and] profit." (Cathay Tr. 69.)

- 2 -

Design Trend completed some of the work, invoicing Cathay along the way for both the cost of the work and sales tax (which Cathay paid), but Design Trend not complete the entire job by June 8, 2001. The record does not disclose what happened that June, but on July 11, 2001, Cathay and Candlewood terminated their franchise agreement. A few days later, principals from Cathay and Design Trend met to discuss the construction project. This meeting resulted in a letter agreement with new deadlines, including specified milestones on July 31 and August 15, and a total completion deadline of August 31, 2001 (which included "punch," *i.e.*, the small repairs and touch-ups that the owner typically requests after the builder declares the project substantially complete). Design Trend and Cathay also agreed on a reduced contract price. As discussed further below, the bankruptcy court made no specific finding about this reduced price. However, various documents sworn to under penalty of perjury by Cathay's principal (also discussed further below) state that the new contract amount was $1,209,737.45. (*See* Design Trend Tr. 56, 83.)

By this point, Cathay had paid Design Trend $986,707.80. Still, Design Trend did not meet the new deadlines. Throughout August and September 2001, Cathay's principal wrote numerous letters to Design Trend's principal, describing work that needed to be done and insisting that Design Trend do it. One such letter, for example, states:

> Today is September 10, 2001, for the record, I still only have 42 poolside rooms turned over from you. Nothing else. Beginning of October we have on the book reservation [*sic*] of $80,000.00 and I need my hotel back to conduct my business. You are on notice that I will hold you responsible for the monetary loss if I do not have my rooms back at that time. You need to finish your work and get out of here.

(Cathay Tr. 110.) Design Trend's principal later admitted that he ignored these letters.

### B.  Registrar of Contractors Proceedings

The parties' relations between September 2001 and February 2002 are not clear, although there is some evidence that Design Trend performed work on the hotel in October 2001. Also, at some unspecified point, Cathay hired another contractor to either repair damage caused by Design Trend or complete a few specific work items that Design Trend

- 3 -

1   should have completed. Cathay paid $36,199.58 for that work.

2         In February 2002, Cathay filed a sworn complaint against Design Trend with the
3   Arizona Registrar of Contractors. Cathay's Registrar complaint identified the contract with
4   Design Trend as a written contract, and stated that the contract date was January 23, 2001
5   (*i.e.*, the printed date on the contract, rather than the date the parties signed the contract).
6   Cathay then listed the contract amount as $1,209,737.45, and argued, "There are total five
7   phases of job. Phase V was never touched. Phase I through IV was only 50% completed."
8   (Design Trend Tr. 56.) Cathay attached a seven-page list containing both relatively minor
9   issues (*e.g.*, "[t]ighten hardware on cabinets") and potentially significant problems (*e.g.*,
10  "[o]ver twenty roof leaks," "[a]ir conditioning control [in handicapped-accessible room] is
11  mounted on the ceiling").

12        A Registrar inspector visited Cathay's hotel on April 8, 2002. Three days later, the
13  inspector issued a "corrective work order," requiring Design Trend to fix many of the
14  problems about which Cathay complained, including relatively minor problems such as paint
15  stains and relatively major problems such as roof damage. (Design Trend Tr. 20–21;
16  *compare id.* at 57.) Sometime later, the inspector returned to follow up, "but at that time
17  [Cathay's principal] was not prepared to address which items he considered still uncorrected
18  . . . . The inspector noted that although it did not appear that all items on the [corrective work
19  order] had been addressed, it was apparent to him that [Design Trend] had made a very
20  significant effort to remedy the deficiencies it had been directed to correct." (*Id*. at 21.)
21  However, Cathay did not pay Design Trend for any of this work.

22        The Registrar held a hearing before an ALJ on November 12, 2002, attended by
23  representatives of both Cathay and Design Trend. The parties presented testimony about the
24  alleged problems and Design Trend's alleged efforts to remedy the problems. In a written
25  decision dated November 27, 2002, the ALJ concluded, in relevant part, that: (i) Design
26  Trend and Cathay had entered into a contract in January 2001 with an "original contract price
27  [of] $1,209,737.45"; and (ii) Design Trend still needed to complete certain repairs at
28  Cathay's hotel (specifically, fixing some peeling paint and a piece of trim), and ordered the

1  parties to set a time that Design Trend's workers could return to the hotel and finish the job.
2  (*Id.* at 26–27.)

3        On November 13, 2002 — *i.e.*, one day after the ALJ hearing and before the ALJ had
4  issued his written decision — Cathay filed a second Registrar complaint against Design
5  Trend, alleging deficiencies in Design Trend's work similar to those alleged in the first
6  complaint (*e.g.*, "[t]owel rack was never installed," "closet still needs to be painted," "the
7  sink needs to be caulked"). These deficiencies covered 85 different hotel rooms. (*Id.* at
8  83–90.) Cathay's second Registrar complaint, like its first, claimed a written contract entered
9  into on January 23, 2001 with a price of $1,209,737.45. (*Id.* at 83.)

10       The same Registrar inspector who handled the first complaint conducted another
11 inspection on December 16, 2002, and issued another corrective work order on December
12 30, 2002, requiring repairs in 74 hotel rooms. Design Trend went to work on some of the
13 repairs in late January and early February 2003, but refused to perform other repairs,
14 claiming that they were outside the scope of its contract with Cathay. (*Id.* at 31–32.) Cathay
15 again did not pay for any of Design Trend's work.

16       The Registrar held another hearing (in front of a different ALJ) on May 16, 2003.
17 Based on that hearing, the ALJ issued a written decision, concluding, in relevant part, that:
18 (i) Design Trend and Cathay had entered into a contract in January 2001 with an "original
19 contract price [of] $1,209,737.45"; and (ii) Cathay had not met its evidentiary burden to show
20 that any of the alleged remaining problems fell within the scope of the contract with Design
21 Trend. Thus, by implication, the ALJ concluded that Design Trend completed its work on
22 the hotel project in February 2003. The ALJ therefore dismissed Cathay's second complaint.

23       **C.    Superior Court and Bankruptcy Proceedings**

24       In January 2002, while Cathay and Design Trend were in the midst of Registrar
25 proceedings, an electrical subcontractor filed suit in Maricopa County Superior Court against
26 Cathay and Design Trend, seeking payment for work done as part of the renovation project.
27 Cathay and Design Trend cross-claimed against each other for breach of contract.

28       The record contains very little about what happened in this lawsuit until February

- 5 -

1    2004, at which point it appears that Cathay and Design Trend were the only parties still
2    litigating. Design Trend then filed a motion asking the Superior Court to declare that the
3    Registrar proceedings had *res judicata* effect on certain issues in the lawsuit. The Superior
4    Court granted Design Trend's motion, finding that, "in the two cases decided by the ALJ, the
5    issues of abandonment of the contract and refusal to perform were decided in favor of Design
6    Trends [*sic*] and thus are *res judicata* in the case at bar." (*Id.* at 107.) The Court further
7    found that the Registrar's "Conclusions of Law as to A.R.S. § 32-1154 (A) 3 [prohibiting
8    contractors from violating the Registrar's rules] and 1154 (A) 7 [prohibiting contractors from
9    committing fraud] . . . in favor of Design Trends [*sic*] are also *res judicata* with respect to the
10   particular claim." (*Id.*)

11   In August 2004, the Superior Court issued an order clarifying the effect of its previous
12   *res judicata* ruling. The Superior Court listed four issues remaining for the jury to decide,
13   none of which related to the timeliness of Design Trend's performance — a question that
14   becomes important below.

15   Trial in the Superior Court was set to begin on September 8, 2004. On September 7,
16   2004, Cathay filed for bankruptcy. The Superior Court action was then removed to the
17   bankruptcy court as an adversary proceeding.

18   It appears that between September 2004 and September 2007, nothing of substance
19   happened in the adversary proceeding. However, sometime after September 2007, the
20   bankruptcy court reconsidered the Superior Court's *res judicata* ruling and eventually
21   decided that "breach[] for failure to timely perform . . . may still be on the table." (Design
22   Trend Opening Br. at 7, Doc. 18 at 13.) According to Design Trend, the bankruptcy court
23   believed that timeliness of completion was not within the Registrar's jurisdiction, and
24   therefore could not be *res judicata*. (*Id.*)

25   The adversary proceeding went to trial in late January 2009. In the run-up to trial,
26   Cathay made clear that it wanted "recoupment and or set off as against amounts paid or
27   claimed by [Design Trend]." (Design Trend Tr. 148.) At trial, however, Cathay put on no
28   evidence of reasonable rental value or lost business opportunity (perhaps conceding to the

- 6 -

consequential damages waiver in the contract).

In November 2009, the bankruptcy court issued its written findings and conclusions. The bankruptcy court's most important findings are as follows: (1) Design Trend and Cathay entered into a construction contract in March 2001 with an agreed price of $1,277,000 (*id.* at 257); (2) Design Trend and Cathay modified their contract in July 2001, changing certain deadlines and the payment schedule, and reducing the "overall cost/price," although the bankruptcy court did not specify this new price (*id.* at 257–58); (3) by July 2001, Cathay had paid Design Trend $986,707.80; and (4) "[Design Trend] breached its amended construction contract with [Cathay] by not completing its work on the project timely per the scheduled agreed to by the parties; and [Design Trend] did not complete its work within a reasonable period of time in any event. Therefore, [Cathay] is entitled to judgment denying [Design Trend] any recovery on its claim" (*id.* at 260). The Court subsequently awarded Cathay attorneys fees under A.R.S. § 12-341.01, and costs under Fed. R. Bankr. P. 7054(b). (*Id.* at 266, 272.)

**II.   Analysis**

    **A.   Preclusive Effect of Registrar Proceedings and Superior Court Proceedings**

Design Trend believes that proceedings in front of the Registrar resolved the issue of timely performance. Design Trend therefore argues that the bankruptcy court erred when it allowed Cathay to rely on Design Trend's untimely performance as a defense to Design Trend's breach of contract claim.

Design Trend actually asserts two errors here: (1) the bankruptcy court violated the law-of-the-case doctrine by revisiting the Superior Court's ruling on the preclusive effect of the Registrar proceedings, and (2) the bankruptcy court violated 28 U.S.C. § 1738 by not giving the Registrar proceedings the same preclusive effect that Arizona courts would give them. Resolving the second argument informs the analysis of the first argument, and the Court will therefore address these arguments in that order.

### 1. Arizona Preclusion Based on Administrative Findings

This Court reviews questions of state-law "full faith and credit," *res judicata*, and collateral estoppel *de novo*. *Jones v. Bates*, 127 F.3d 839, 848 (9th Cir. 1997). Federal law requires the bankruptcy court to give the Registrar proceedings "the same full faith and credit . . . as they have by Law or usage in the courts of [Arizona]." 28 U.S.C. § 1738. In Arizona, "[b]oth doctrines of *res judicata* and collateral estoppel may apply to decisions of administrative agencies acting in a quasi-judicial capacity." *Hawkins v. State*, 183 Ariz. 100, 103, 900 P.2d 1236, 1239 (Ct. App. 1995). But these doctrines operate differently:

> Under the doctrine of *res judicata*, a judgment on the merits in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. This doctrine binds the same party standing in the same capacity in subsequent litigation on the same cause of action, not only upon facts actually litigated but also upon those points which might have been litigated . . . .
>
> The doctrine of "collateral estoppel" is a doctrine of issue preclusion. It bars a party from relitigating an issue identical to one he has previously litigated to a determination on the merits in another action. The elements necessary to invoke collateral estoppel are: the issue is actually litigated in the previous proceeding, there is a full and fair opportunity to litigate the issue, resolution of such issue is essential to the decision, there is a valid and final decision on the merits, and there is a common identity of the parties.

*Id.* (quoting *Gilbert v. Bd. of Med. Exam'rs*, 155 Ariz. 169, 174, 745 P.2d 617, 622 (Ct. App. 1987) (citations omitted)). For present purposes, the major difference between *res judicata* and collateral estoppel is that the former bars relitigation of every issue that might have been litigated, but the latter precludes relitigation only of issues actually litigated. Design Trend argues that the Registrar's decision should be *res judicata*, thus barring Cathay from relitigating any breach of contract theory.

In this case, *res judicata* does not apply. When Cathay complained to the Registrar about Design Trend's work, Cathay was not suing Design Trend for breach of contract. Nor could Cathay sue for breach of contract in front of the Registrar. The Registrar has a

statutory jurisdiction limited to certain powers it may exercise over contractors. This Court could locate no authority stating that a party's choice to file a complaint with the Registrar substitutes for a breach of contract cause of action. The Registrar *does* have power to "resolve bona fide contractual disputes, involving licensed contractors, to determine whether or not a contractor violated A.R.S. § 32-1154(3) [prohibiting departure from plans or specifications without consent, now codified at A.R.S. § 32-1154(A)(2)]." *J.W. Hancock Enters., Inc. v. Ariz. State Registrar of Contractors*, 142 Ariz. 400, 408, 690 P.2d 119, 127 (Ct. App. 1984). This is a power "ancillary to [the Registrar's] regulatory mission," *id.* at 406, 690 P.2d at 125, and has been viewed as extending to all contractual disputes necessary to adjudicating an alleged regulatory violation, *see Sunpower of Ariz. v. Ariz. State Registrar of Contractors*, 166 Ariz. 437, 441, 803 P.2d 430, 434 (Ct. App. 1990). But resolving such factual disputes gives rise only to collateral estoppel, not *res judicata*. *J.W. Hancock*, 142 Ariz. at 410, 690 P.2d at 129 (giving Registrar's findings collateral estoppel effect).

The question, then, is the collateral estoppel effect of the Registrar proceedings. When Cathay complained to the Registrar, Cathay subjected certain factual issues to the Registrar's adjudication, specifically, the existence of the contract, the amount of the contract, whether Design Trend rendered a workmanlike performance, and whether it abandoned the project. The Registrar has jurisdiction over these questions. *See* A.R.S. § 32-1154(A)(1), (3), (9) (forbidding contractors from abandoning without justification, from failing to complete a project for the stated contract price, and from disobeying the Registrar's rules); *id.* § 32-1154(B) (mandating Registrar's investigation "on the written complaint of any owner . . . that is a party to a construction contract who suffers a material loss or injury as a result of a contractor's failure to perform work in a professional and workmanlike manner"); A.A.C. R4-9-108 (establishing workmanship standards). Through a series of inspections and ALJ hearings, the Registrar ultimately found that a written contract existed for a certain price, that Design Trend had not abandoned the project, and that workmanship violations had been remedied. Thus, the Registrar adjudicated at least four factual issues, two of which Cathay might have asserted as breaches of contract: substandard workmanship,

- 9 -

1 and failure to complete the project. Cathay is collaterally estopped from relitigating any of
2 these issues.

3 Design Trend asserted to the Superior Court and the bankruptcy court that
4 adjudication of these issues necessarily adjudicated the issue of timely performance as well.
5 The Superior Court seemed to agree, but the bankruptcy court did not. This Court agrees
6 with the bankruptcy court. Design Trend appears to believe that the Registrar's no-
7 abandonment finding equates to a finding of timely performance. This Court sees no such
8 equivalence. Whether Design Trend abandoned the project and whether it finished the
9 project on time are different questions. Timely performance was not actually litigated in the
10 Registrar proceedings. The bankruptcy court therefore did not err when it permitted Cathay
11 to raise the timely performance issue at trial.

### 2. Law of the Case

13 Design Trend argues that, at minimum, the law of the case doctrine does not allow the
14 bankruptcy court to depart from the Superior Court's decision barring Cathay from arguing
15 untimely performance. Generally, law of the case is only applicable to lower court
16 proceedings after a case has been remanded from a higher court. However, to the extent it
17 may apply to successive judges before an appeal, the Court finds that the bankruptcy court
18 did not violate it.

19 According to the Ninth Circuit, deviations from law of the case are reviewed under
20 an unusually specific abuse of discretion standard:

> While courts have some discretion not to apply the doctrine of law of the case, that discretion is limited. Depending on the nature of the case or issue and on the level or levels of the courts or courts involved, a court may have discretion to reopen a previously resolved question under one or more of the following circumstances:
> (1) the first decision was clearly erroneous;
> (2) an intervening change in the law has occurred;
> (3) the evidence on remand is substantially different;
> (4) other changed circumstances exist;
> (5) a manifest injustice would otherwise result.

- 10 -

*Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir. 1993). Here, the first consideration validates the bankruptcy court's decision to revise the Superior Court's ruling. The Superior Court clearly erred when it precluded Cathay from arguing that it had been injured by Design Trend's untimely performance. The Registrar simply had not decided that issue. Accordingly, the bankruptcy court did not abuse its discretion in departing from the Superior Court's decision.

### B. Breach & Waiver

Design Trend's remaining arguments essentially revolve around whether the bankruptcy court could excuse Cathay from paying for Design Trend's work. This, in turn, depends on whether Design Trend materially breached the contract, and whether Cathay waived the breach in any event. In Arizona, materiality of breach and waiver are both fact questions. *Foundation Dev. Corp. v. Loehmann's, Inc.*, 163 Ariz. 438, 446, 788 P.2d 1189, 1197 (1990) (materiality of breach); *Goglia v. Bodnar*, 156 Ariz. 12, 19, 749 P.2d 921, 928 (Ct. App. 1987) (waiver). This Court reviews findings of fact for clear error. Fed. R. Bankr. P. 8013.

At first glance, this case seems to fall squarely within a typical scenario described in the Restatement:

> In an important category of disputes over failure of performance, one party asserts the right to payment on the ground that he has completed his performance, while the other party refuses to pay on the ground that there is an uncured material failure of performance. A typical example is that of the building contractor who claims from the owner payment of the unpaid balance under a construction contract.

*Restatement (Second) of Contracts* § 237 cmt. d (1981). This case differs somewhat from the typical scenario, however, because the only alleged "material failure of performance" is a particularly long delay in completing performance. Given what the Registrar decided, Cathay could no longer argue that Design Trend rendered incomplete or defective performance. Instead, Cathay could only assert that Design Trend's delay in performing was the single, material breach, thus excusing Cathay from its remaining contract obligations (*i.e.*,

- 11 -

paying the amount it still owed).  *See* Ariz. Pattern Jury Inst.-Civil Contract 9 (4th ed. 2005) (material breach by one party excuses performance by the other party).[1]

The Court will not address whether the delay alone constituted material breach because the Court concludes that the question of waiver controls in any event.  "Waiver is the voluntary and intentional relinquishment of a known right or such conduct as warrants an inference of the relinquishment of such right."  *City of Tucson v. Koerber*, 82 Ariz. 347, 356, 313 P.2d 411, 418 (1957).  "A party to a contract waives a breach of a contract by permitting the other party to perform."  *Indep. Nat'l Bank v. Westmoor Elec., Inc.*, 164 Ariz. 567, 573, 795 P.2d 210, 216 (Ct. App. 1990).  In the construction context specifically, "once a material breach in a partially-performed construction contract has occurred, the non-defaulting party must elect to . . . waive the breach and continue performance, or terminate the contract and sue for damages; and if the innocent party elects to continue performance he thereby waives the breach and he may not recover damages therefor."  *Hunter Contracting Co. v. Sanner Contracting Co.*, 16 Ariz. App. 239, 244, 492 P.2d 735, 740 (1972).

The waiver issue in this case is somewhat unusual because the bankruptcy court did not express any finding about waiver, yet the parties argue as if it did.  Nonetheless, because the bankruptcy court could not have ruled in favor of Cathay without rejecting Design Trend's waiver theory, the Court will infer a no-waiver finding and review it accordingly.  *See Vance v. Am. Hawaii Cruises, Inc.*, 789 F.2d 790, 792–93 (9th Cir. 1986) (reviewing court may imply findings that necessarily flow lower court's explicit findings); *Carr v. Yokohama Specie Bank, Ltd.*, 200 F.2d 251, 255 (9th Cir. 1953) ("Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. It is sufficient if

---

[1] Cathay's argument could also be analyzed under doctrine of substantial performance, but that is really just the opposite side of the material breach coin: "In [contractor-suing-for-the-unpaid-balance] cases it is common to state the issue, not in terms of whether there has been an uncured material failure by the contractor, but in terms of whether there has been substantial performance by him. This manner of stating the issue does not change its substance . . . ."  *Restatement (Second) of Contracts* § 237 cmt. d (1981).

- 12 -

1  the special affirmative facts found by the court, construed as a whole, negat[e] each rejected
2  contention.").

3  Here, it was clear error for the bankruptcy court to find a lack of waiver. Despite
4  Design Trend's tardiness, Cathay continually asked Design Trend to come back and finish
5  the job. Cathay twice took Design Trend to the Registrar to ensure that Design Trend
6  finished the job. Design Trend certainly did not show itself to be a saint — its principal
7  admitted that, at one point, he began ignoring Cathay's demands (most of which the
8  Registrar's inspector validated), and Design Trend only finished the job under threat of
9  punishment by the Registrar. But Cathay could not continually require Design Trend to
10 return and finish the job and then refuse to pay. This clearly constitutes "such conduct as
11 warrants an inference of [waiver]." *City of Tucson*, 82 Ariz. at 356, 313 P.2d at 418.

12 In a typical delayed construction case, an owner who permits late performance must
13 pay the contract price but can offset some of that price with damages caused by the
14 contractor's delay. *See*, *e.g.*, Joseph M. Perillo, *Calamari and Perillo on Contracts* § 11.33
15 (6th ed. 2009) ("If . . . the owner allows the contractor to continue and the contractor
16 subsequently finishes within a reasonable time from the time of the election, the owner must
17 pay the price but is still entitled to damages for partial breach because of the late
18 completion.").[2] Here, Cathay repeatedly claimed that Design Trend's delay caused a loss in
19 business, but Cathay offered no evidence of potential lost profits or any other form of
20 consequential damages — possibly because the contract contained a consequential damages

---

[2]Theoretically, one could argue that the Prof. Perillo's phrase, "within a reasonable time from the time of the election," dooms Design Trend because the bankruptcy court concluded that Design Trend "did not complete its work within a reasonable period of time in any event." (Design Trend Tr. 260.) However, it is not clear the bankruptcy court made this finding in comparison to "the time of the election." And if it did, it was clearly erroneous. Cathay filed its second Registrar complaint on November 13, 2002. Thus, as of at least that date, it signaled its willingness to allow Design Trend to return and complete the work. After the inspection process — a typical part of Registrar proceedings — Design Trend returned and finished that work by February 2003. Given the circumstances, this was "within a reasonable time from the time of the election."

- 13 -

1 waiver. That, however, was a risk the two sophisticated parties allocated at the outset. In 2 any event, with no evidence of damages caused by the delay, Cathay cannot offset what it 3 still owes under the contract. It must therefore pay what it agreed to pay.

### C. Costs & Attorneys Fees

Given the foregoing, the Court reverses the bankruptcy court's award of costs and attorneys fees to Cathay.

### D. Amount of Damages

Some confusion exists about the amount Cathay still owes to Design Trend. This confusion arises largely from conflicts between Registrar findings and the bankruptcy court's findings, as well as from the mass of evidence introduced at the trial before the bankruptcy court. This Court could remand for further proceedings, directing the bankruptcy court to calculate damages with specificity. However, the Court has chosen to resolve this issue now for three reasons. First, given that the bankruptcy court is an arm of this Court, this Court has power to retain jurisdiction over this issue. *See* Fed. R. Bankr. P. 8013 (giving this Court power to "modify" the bankruptcy court's judgment). Second, the collateral estoppel effect of the Registrar proceedings and concessions made at oral argument appear to be enough for this Court to calculate damages. Third, this lawsuit has been pending for nine years, and the Court believes it is in the interests of justice to resolve it now, rather than remand for additional proceedings.

The Registrar found that Design Trend's written contract with Cathay arose in January 2001 with an "original contract price [of] $1,209,737.45." These findings match Cathay's representations to the Registrar. The bankruptcy court, by contrast, found that the contract arose in March 2001 with an original price of $1,277,000, adjusted downward to an unspecified amount in July 2001. The bankruptcy court further found that Cathay had paid Design Trend $986,707.80.

Given that both parties appeared before the Registrar and had an opportunity to argue their respective cases, the Registrar's findings about the date of the contract and the agreed-upon price control by virtue of collateral estoppel. The January/March disparity makes no

- 14 -

1  difference — the contract was originally dated January 23, 2001, but not signed until March
2  14, 2001. However, the "original contract price [of] $1,209,737.45" does present some
3  difficulty, because it suggests that the July 2001 price reduction was something lower than
4  $1,209,737.45.

5  The Court considers the Registrar's characterization of "original . . . price" to be a
6  harmless misunderstanding. Given that: (a) the written contract plainly states a price of
7  $1,277,000; (b) all parties agree that the contract price was reduced in July 2001; (c) no party
8  has claimed that the contract price was reduced again after that; (d) Cathay's principal
9  executed *two* sworn statements claiming that the contract amount was $1,209,737.45 (*i.e.*,
10 less than $1,277,000); and (e) each of Cathay's sworn statement came *after* the July 2001
11 reduction, the Court concludes that the agreed upon price after July 2001 was $1,209,737.45.
12 Subtracting from that figure the amounts Cathay already paid ($986,707.80) yields a
13 preliminary damages figure of $223,029.65.

14 At this point, the Court must account for various additions and offsets. Cathay claims
15 that it should receive an offset for the other contractors it paid to fix and/or complete some
16 of Design Trend's work. Cathay paid those contractors $36,199.58. At oral argument,
17 counsel for Design Trend conceded that Cathay deserved some amount of offset, estimated
18 around $27,000, but counsel also conceded that the difference between Cathay's claim and
19 his own $27,000 estimate was not worth a remand. Therefore, the Court accepts Cathay's
20 figure of $36,199.58, and will credit Cathay that amount, reducing damages to $186,830.07.

21 Design Trend's counsel also admitted that Design Trend was responsible for
22 approximately $2,000 that Cathay paid for fixing certain punch list items. The Court will
23 accordingly credit Cathay an additional $2,000, reducing damages to $184,830.07.

24 Design Trend claims that Cathay should pay sales tax on the amounts it owes to
25 Design Trend. Cathay, by contrast, claims that it deserves to be reimbursed for the sales tax
26 it previously paid to Design Trend because the contracts says, "The Contractor shall pay
27 sales . . . taxes which are legally enacted when bids are received or negotiations concluded."
28 The interpretation of a contract is an issue this Court may review de novo. *County of*

- 15 -

*Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1243 (9th Cir. 2009). The Court concludes that Cathay misinterprets the contract. The contract's statement that "[t]he Contractor shall pay sales . . . taxes" does not mean that the contractor agrees to absorb the sales tax. Rather, it allocates responsibility to the contractor for remitting taxes owed. The fact that the contract's cost schedule explicitly includes sales tax as a line item, that Design Trend invoiced for sales tax, and that Cathay paid it, demonstrates the parties' understanding that the contract shifted the burden of those taxes ultimately to Cathay.

The contract calculated sales tax at 4.875%. At that rate, Cathay should pay an extra $9,010.47 ($184,830.07 * 0.04875). The Court will therefore direct entry of judgment in Design Trend's favor for $184,830.07 + $9,010.47, or $193,840.54. If the Court has misinterpreted Design Trend's concessions at oral argument, or if the Court has committed a mathematical error, the Court will entertain a concise motion under Rule 59(e) or Rule 60(a), as appropriate. Design Trend may submit its claim for attorneys fees in accord with Fed. R. Civ. P. 54(d)(2) and LRCiv 54.2.

**III.    Conclusion**

From a broad perspective, this case reduces to competing instances of injustice. Design Trend wants money it perhaps does not deserve, and Cathay wants services without paying any money. The Court believes the foregoing resolution is the lesser injustice for two reasons. First, delay is endemic in construction projects, which is why the law provides for consequential damages — but Cathay waived consequential damages from the outset, leaving it only with the option to terminate for material delay. Second, Cathay had opportunity as early as August 2001 to declare a breach, terminate Design Trend, hire a new contractor, and sue Design Trend for the difference (if any) between what the new contractor charged and what Cathay would have paid under the Design Trend contract. Cathay instead repeatedly chose to bring Design Trend back. In these circumstances, Cathay cannot keep the benefit of Design Trend's services without paying, even if Design Trend was very late in performing those services.

IT IS THEREFORE ORDERED that the final decision of the bankruptcy court is REVERSED.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Design Trend and against Cathay in the amount of $193,840.54, plus interest at the federal judgment rate from the date of judgment until paid. The Clerk shall terminate this case.

DATED this 28th day of March, 2011.

Neil V. Wake
United States District Judge