1   **WO**

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT

7           FOR THE DISTRICT OF ARIZONA

8

9   Design Trend International Interiors, Ltd.,        No. CV-10-01079-PHX-NVW
    an Arizona corporation,
10
                        Appellant,                     **ORDER**
11
    vs.
12
    Cathay Enterprises, Inc., an Arizona
13  corporation,

14                      Appellee.

15

16          Before the court are questions of prejudgment interest and attorneys' fees.

17  Plaintiff/Appellant Design Trend International Interiors, Ltd. ("Design Trend") was

18  previously awarded damages of $169,025.22, with prejudgment interest at the Arizona

19  statutory rate of 10% and postjudgment interest at the federal statutory rate of 0.26%.

20  (Doc. 93.)  Attorneys' fees were awarded in the amount requested of $382,966.44, plus

21  taxable costs of $10,203.93.  *Design Trend Int'l Interiors, Ltd. v. Cathay Enters.*, No. CV

22  10-01079-PHX-NVW, 2012 WL 727257, at *7, 2012 U.S. Dist. LEXIS 29045, at *17 (D.

23  Ariz. Mar. 6, 2012).

24          Judgment was originally entered on March 29, 2011, but the court concluded on

25  reconsideration that it had erred in overlooking prejudgment interest and that

26  Defendant/Appellee Cathay Enterprises, Inc. ("Cathay") was entitled to additional

27  findings on some claimed offsets that the Bankruptcy Court had not addressed.  In light

28

of the nearly ten years this dispute had already been in litigation, this court withdrew the reference of the adversary proceeding to make those additional findings here.  (Doc. 69 at 8.)  The March 29, 2011 judgment was vacated in light of the need to change the award, and a corrected judgment was entered on March 6, 2012.  (Doc. 93.)  The corrected judgment was backdated to the date of the original judgment, March 29, 2011, so no party would suffer from the fortuity that the original judgment was vacated and replaced. (Doc. 92, 93.)  But this court did not explain its reason for making the second judgment *nunc pro tunc*.

The Court of Appeals affirmed the principal damage award but reversed and remanded the calculations of prejudgment interest and attorneys' fees.  This court "erred in using the equitable remedy of *nunc pro tunc* to backdate its order for the purpose of calculating prejudgment interest."  (Doc. 113-1 at 4.)  In accordance with the mandate of the Court of Appeals, this court now addresses the rate of prejudgment interest to apply up to the date of a final judgment, not the *nunc pro tunc* date of the original judgment. Under Arizona statute, Design Trend is entitled to interest at 10% per annum on that liquidated obligation until judgment.

Because the Court of Appeals reversed and remanded the judgment of March 6, 2012, the question arises whether the prejudgment interest rate stops on the date of that former final judgment or continues until entry of a new final judgment on remand.  The Bankruptcy Court recently shed light on this question when it ruled, at Cathay's urging, that the March 6, 2012 judgment is not final in any part and nothing may yet be paid under it.   Consistent with that decision and with principles of judgment interest independent of that ruling, in the specific circumstances of this case it is more equitable for the prejudgment interest rate to continue until entry of a final judgment on remand.

The Court of Appeals also remanded for "further explanation and, if necessary, recalculation" of the award of attorneys' fees because this court "did not give enough information to determine whether the attorneys' fees award was reasonable" and failed to

indicate that it "excluded fees that could be attributed to work performed during the bankruptcy proceedings unrelated to the contract dispute."  (Doc. 113-1 at 4-5.)  This court now addresses in more detail why it awards attorneys' fees in its discretion under state law and why all the attorneys' fees directly incurred in the bankruptcy case are intertwined with the contract claim and therefore awardable.

Judgment will be entered in favor of Design Trend against Cathay in the amounts of:  $169,025.22 for damages; $199,218.22 for prejudgment interest at the rate of 10% per annum from June 5, 2003, until March 16, 2015; $381,936.14 for attorneys' fees; $10,203.93 for taxable costs; and postjudgment interest on all those amounts at the federal rate of 0.25% from March 16, 2015, until paid.

The award for attorneys' fees and taxable costs exceeds the damages and interest, but that is to be expected when a dogged defense through fourteen years of litigation ends in adjudication on the merits, not capitulation.  The prejudgment simple interest at 10% per annum equates to only 6.83% compound interest.  The effective interest rate on the cost to Design Trend is much lower, probably under 4%, because there is no prejudgment interest on the attorneys' fees and taxable costs incurred over many years.   In this commercial dispute between sophisticated parties, these are modest and foreseeable consequences of playing hard and losing.

# I.   PREJUDGMENT INTEREST

## A.   Summary

The question presented is whether, under a 2011 amendment to Arizona Revised Statutes § 44-1201, a party owing a liquidated sum, on which 10% interest accrues until entry of judgment, partially extinguishes that accrued interest obligation by not paying it.  By forcing the creditor to sue and reduce his claim to judgment, does the debtor make the lower postjudgment interest rate apply backwards to oust part of the prejudgment interest previously accrued at 10%?

The answer is no.  First, the language of the 2011 amendment leaves in place the 10% prejudgment interest rate on liquidated obligations without an agreed rate.  The language falls far short of compelling a partial forfeiture of past interest.  Second, if the "plain language" of the amendment did favor forfeiture—which it does not—that conclusion would be perverse.  Even "plain language" in a statute does not compel an absurd result.  Third, under the Applicability section of the Session Laws, the amendment "applies to all loans that are entered into, all debts and obligations that are incurred and all judgments that are entered on or after the effective date of this act."  2011 Ariz. Sess. Laws 99, § 17.  The liquidated obligation in this case was incurred long before the effective date of the 2011 amendment.  So even if that amendment in general purports to defeat accrued interest upon later entry of a judgment, Cathay's breach-of-contract debt is excluded.

**B.** **The 2011 Amendment of A.R.S. § 44-1201 Leaves in Place Prejudgment Interest at 10% on Liquidated Obligations with No Agreed Rate of Interest**

Federal judgment creditors are entitled to interest "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield."  28 U.S.C. § 1961(a).  The federal statute is silent on how much prejudgment interest, if any, should be provided in the judgment.  "Substantive state law determines the rate of prejudgment interest in diversity actions."  *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1332 (9th Cir. 1995) (citation omitted).  This case is equivalent to a diversity case removed to federal court.  (Doc. 92 at 6; *In re Banks*, 225 B.R. 738, 750 (Bankr. C.D. Cal. 1998) ("The removed [adversary proceeding] is equivalent to a diversity action, as it is not brought under any aspect of federal law and is in this court only due to its relationship to the [core] bankruptcy.").)  Design Trend is therefore entitled to prejudgment interest in the amount Arizona law provides for a liquidated obligation with no agreed rate of interest.

### 1. Statutory Text and History

Before July 20, 2011, Arizona had a simple regime for interest on judgments and interest owing without entry of a judgment. Under former A.R.S. § 44-1201, an agreed legal rate of interest governed both prejudgment and postjudgment. Otherwise, 10% was the rate on judgments and for interest owing even without entry of a judgment. The statute said:

> A. Interest on any loan, indebtedness, judgment or other obligation shall be at the rate of ten per cent per annum, unless a different rate is contracted for in writing, in which event any rate of interest may be agreed to.
> . . .
> C. A judgment given on an agreement bearing a higher rate not in excess of the maximum permitted by law shall bear the rate of interest provided in the agreement, and it shall be specified in the judgment.

A.R.S. § 44-1201 (2003 & Supp. 2010); *see also Metzler v. BCI Coca-Cola Bottling Co. of L.A.*, 235 Ariz. 141, 145, 329 P.3d 1043, 1047 (2014) ("[F]rom 1992 to 2011, § 44-1201 did not differentiate between judgments and other obligations, or between prejudgment and post-judgment interest on judgments."). Judicial decisions added to the law of prejudgment interest in this sparse statute.

In 2011, the Legislature amended § 44-1201 to codify elements of case law and to make two changes (one of which, prohibition of interest on punitive damages, has no bearing on this case). For interest on any "loan, indebtedness or other obligation" except a judgment, the prior statutory language was left in place. If the parties have agreed to a rate, that rate governs; otherwise the rate is 10%. The other change was to reduce judgment interest in cases without an agreed rate, from the previous 10% to the lesser of 10% or 1% above the prime rate. This change sets a variable market rate for judgment interest, but capped at 10%, unless the parties have agreed to a different rate.

The 2011 amendment achieves this by adding some new language while leaving other language in place.  The amended text of § 44-1201 is as follows (~~strikeout~~ shows deletions, <u>underline</u> shows additions):

A. Interest on any loan, indebtedness ~~judgment~~ or other obligation shall be at the rate of ten per cent per annum, unless a different rate is contracted for in writing, in which event any rate of interest may be agreed to.  <u>Interest on any judgment that is based on a written agreement evidencing a loan, indebtedness or obligation that bears a rate of interest not in excess of the maximum permitted by law shall be at the rate of interest provided in the agreement and shall be specified in the judgment.</u>

<u>B. Unless specifically provided for in statute or a different rate is contracted for in writing, interest on any judgment shall be at the lesser of ten per cent per annum or at a rate per annum that is equal to one per cent plus the prime rate as published by the board of governors of the federal reserve system in statistical release H.15 or any publication that may supersede it on the date that the judgment is entered.  The judgment shall state the applicable interest rate and it shall not change after it is entered.</u>

. . .

<u>D.  A court shall not award either of the following:</u>

<u>1.   Prejudgment interest for any unliquidated, future, punitive or exemplary damages that are found by the trier of fact.</u>

<u>2.   Interest for any future, punitive or exemplary damages that are found by the trier of fact.</u>

<u>E.  For the purposes of subsection D of  this section, "future damages" means damages that will be incurred after the date of the judgment and includes the costs of any injunctive or equitable relief that will be provided after the date of the judgment.</u>

<u>F.   If awarded, prejudgment interest shall be at the rate described in subsection A or B of this section.</u>

2011 Ariz. Sess. Laws 99, § 15.  The new, underlined text in subsections (A) and (B) states the rate for postjudgment interest under Arizona law: either an agreed rate or,

- 6 -

failing that, the lower of 10% or the prime rate plus 1%.  Subsection (A) sets the interest rate at 10% on obligations other than judgments, unless a different rate is agreed.

### 2. Subsection (F) Affirms Subsection (A)'s Rate for Prejudgment Interest on Obligations Without an Agreed Rate

Under the new A.R.S. § 44-1201(F), any prejudgment interest awarded "shall be at the rate described in subsection A or B of this section."  The first sentence of subsection (A) already states that the prejudgment interest rate is 10% per annum, unless a different rate is agreed in writing.  Subsection (F) restates that a later judgment on an interest obligation that the first sentence of subsection (A) imposes before entry of any judgment shall be at the same rate already accrued before entry of a judgment.  This is the meaning of the plain language and of common sense.

The taxonomy of interest-bearing obligations stated in A.R.S. § 44-1201(A) and (B) supports this reading.  As amended, the text divides those obligations into four categories:

1. Any "loan, indebtedness or other obligation" (except a judgment) without an agreed interest rate—10% applies.  § 44-1201(A) (first clause of first sentence).

2. Any "loan, indebtedness or other obligation" with an interest rate agreed in writing—the agreed rate applies.  § 44-1201(A) (second clause of first sentence).

3. Any "judgment that is based on a written agreement" with an agreed interest rate—the agreed rate applies.  § 44-1201(A) (second sentence).

4. "[A]ny judgment" without a rate agreed in writing—the lesser of 10% or 1% above prime applies.  § 44-1201(B).

Of these four categories, the first fits interest accruing on Cathay's indebtedness to Design Trend before entry of judgment.  The fourth category fits a judgment entered on Design Trend's claim unless the federal statute governs the rate accruing after judgment. When subsection (F) says "prejudgment interest shall be at the rate described in

subsection A or B of this section," it can only mean the interest rate that fits *by the terms of subsection (A) or (B).*

According to Cathay, if a liquidated obligation with no agreed rate is unpaid and eventually reduced to judgment, subsection (F) retroactively reduces the 10% rate after the prejudgment interest has already accrued. Cathay's view is that "pre-judgment interest must be calculated based upon one of the alternative rates described in the added portion of subsection A"—that is, subsection (A)'s second sentence—"or B as amended." (Doc. 115 at 4.) "Pre-judgment interest," Cathay argues, "must be either based upon a written agreement (subsection A), or the prime rate plus one percent (1%) (subsection B)." (*Id.*) Cathay contends that by prescribing "the rate described in subsection A or B," subsection (F) actually instructs courts to ignore the express direction in subsection (A) that "[i]nterest on *any* loan, indebtedness or other obligation *shall* be at the rate of ten per cent per annum . . . ." § 44-1201(A) (emphasis added). Cathay would rewrite subsection (F) to adopt for prejudgment interest the "rate described in subsection B *and not the rate described in subsection A*." (Emphasis added.) This is bare assertion in defiance of statutory text. The plain language of the amended statute leaves in place for prejudgment interest exactly what Cathay says the Legislature repealed.

Arizona case authority consones to the reading that "interest on any judgment" in subsections (A) and (B) means only interest owing because of a judgment. The term does not apply to interest owing even in the absence of a judgment. By contrast, the words "indebtedness" and "other obligation" in subsection (A) encompass a wide range of legal duties beyond those dependent upon existence of a judgment.

In *Metzler*, the Arizona Supreme Court decided whether "the rate for prejudgment interest awarded pursuant to Rule 68(g) is governed by § 44-1201(A) [at 10%] or § 44-1201(B) [at 1% above prime rate]." 235 Ariz. at 144, 329 P.3d at 1046. Rule 68(g) of the Arizona Rules of Civil Procedure provides that if a party "rejects an offer [of judgment] and does not later obtain a more favorable judgment . . . the offeree must pay,

as a sanction . . . prejudgment interest on unliquidated claims to accrue from the date of the offer." Ariz. R. Civ. P. 68(g). (Sanctions under the Arizona offer-of-judgment rule are more robust than those under Federal Rule of Civil Procedure 68.)

The *Metzler* court found the term "obligation" ambiguous, as it could refer to a broad "legal or moral duty" or to a narrower "formal, binding agreement . . . to pay a certain amount or to do a certain thing for a particular person or set of persons." 235 Ariz. at 145, 329 P.3d at 1047 (citations and internal quotation marks omitted). The court applied *ejusdem generis,* the canon of statutory interpretation that "general words [that] follow the enumeration of particular classes of persons or things should be interpreted as applicable only to the persons or things of the same general nature or class." *Id.* (alteration in original) (citation and internal quotation marks omitted). The court concluded that an "obligation" covered by § 44-1201(A) must be similar in nature to a "loan" or "indebtedness." *Id.* at 145-46, 329 P.3d at 1047-48. Specifically, a § 44-1201(A) "obligation," unlike Rule 68 prejudgment interest as a sanction, does not "depend[] on a judgment for its existence." *See id.* at 146, 329 P.3d at 1048. "What would otherwise be an unliquidated claim on which no prejudgment interest is owed," if imposed as a Rule 68 sanction "becomes liquidated, memorialized, and enforceable only when judgment is entered." *Id.* As a result, Rule 68 prejudgment interest is "interest on a judgment," rather than interest on a "loan, indebtedness or other obligation." *Id.* Hence, the lower rate of § 44-1201(B) for interest "on any judgment" applies to prejudgment interest imposed after judgment as a sanction under Rule 68(g). *Id.* Under the logic of *Metzler*, prejudgment interest on a *liquidated* claim—unlike interest that is neither owing nor quantifiable until entry of a judgment under Rule 68—is interest on an "obligation" pursuant to § 44-1201(A) and thus accrues at the 10% rate of subsection (A).

In summary, the plain language of A.R.S. § 44-1201(A) is that interest on a liquidated obligation without an agreed rate accrues before judgment at 10% per annum. Subsection (F) confirms that past accrual upon reduction to judgment when it says that

"prejudgment interest shall be at the rate described in subsection A or B of this section." A.R.S. § 44-1201(F).

### 3. Cathay's Interpretation of the Statute Yields an Absurd Result

In determining meaning, one looks to the language of the statute. "When construing statutes, we begin with the language of the statute itself because we expect it to be the best and most reliable index of a statute's meaning." *Canyon Ambulatory Surgery Ctr. v. SCF Ariz.*, 225 Ariz. 414, 420, 239 P.3d 733, 739 (Ct. App. 2010) (citation and internal quotation marks omitted). "If the statute's language is clear, it controls unless an absurdity or constitutional violation results. But if the text is ambiguous, we also consider the statute's context; its . . . subject matter, and historical background; its effects and consequences; and its spirit and purpose, as well as other applicable canons of statutory construction. We seek to harmonize, whenever possible, related statutory and rule provisions." *Metzler*, 235 Ariz. at 144-45, 329 P.3d at 1046-47 (alteration in original) (citations and internal quotation marks omitted).

The plain language of the statute is the opposite of Cathay's proffered meaning. But if the plain language somehow said what Cathay wants, the "effects and consequences" of that interpretation would be too perverse to be imputed to the Legislature. Cathay's position—that subsection (F) imposes subsection (B)'s lower postjudgment rate on accrued interest for which subsection (A) expressly sets a higher rate—would reward a recalcitrant debtor with a windfall for refusing to pay, forcing litigation, and causing entry of judgment. The Legislature could set a prejudgment interest rate of 1% above prime. But it would be unjust and nonsensical for the Legislature to create an interest obligation and then destroy it by entry of a judgment enforcing it. That is exactly the kind of absurd result that even plain language need not yield. *See id.*

C.   **The Applicability Section of the Session Laws Excludes Obligations Already Incurred from the 2011 Amendment**

Whatever the effect of the 2011 amendment of A.R.S. § 44-1201 in general, it does not apply in this case.  The Applicability section of the 2011 amendment states:

Section 44-1201, Arizona Revised Statutes, as amended by this act, applies to all loans that are entered into, all debts and obligations that are incurred and all judgments that are entered on or after the effective date of this act.

2011 Ariz. Sess. Laws 99, § 17(B).  The amended interest provisions do not apply to any obligation incurred before the amendment.  Cathay's obligation to Design Trend was incurred by 2003, eight years before the revision of § 44-1201.  That obligation is therefore governed by the old § 44-1201, which indisputably mandated prejudgment interest at 10%.

The provision in § 17(B) that the new § 44-1201 applies to judgments entered on or after the date of amendment cannot repeal the preceding words protecting interest on "all loans that are entered into, all debts and obligations that are incurred" before the effective date.  The manifest purpose of § 17(B) is to vindicate obligations and interest incurred before the 2011 amendment.  That purpose would fail if interest on a loan, debt, or obligation already in breach were impaired by the enactment in 2011.

Design Trend is therefore entitled to principal damages of $169,025.22, with prejudgment interest at 10% per annum from June 5, 2003.

II.   **POSTJUDGMENT INTEREST IS AT THE FEDERAL RATE**

Federal postjudgment interest is governed by 28 U.S.C. § 1961(a) "at a rate equal to the weekly average 1-year constant maturity Treasury yield."  But an "exception to § 1961 exists when the parties contractually agree to waive its application."  *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004) (citing *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1107-08 (9th Cir. 1998)).  If a contract "indicates a mutual intent by the parties to have pre- and post-judgment interest calculated at the contract interest rate," then the contract rate applies.  *Citicorp*, 155 F.3d at 1108.  Other

1    circuits concur.  *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 101 (2d Cir. 2004);

2    *Kanawha-Gauley Coal & Coke Co. v. Pittston Minerals Grp., Inc.*, 501 F. App'x 247,

3    254 (4th Cir. 2012); *Hymel v. UNC, Inc.*, 994 F.2d 260, 266 (5th Cir. 1993); *Cent. States,*

4    *Se. & Sw. Areas Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1020 (7th Cir. 2001);

5    *In re Riebesell*, 586 F.3d 782, 794 (10th Cir. 2009).

6    However, courts are divided on how much specificity is needed to waive § 1961.

7    *Compare Westinghouse Credit Corp.*, 371 F.3d at 101-02 (finding agreed interest rates

8    insufficient to waive § 1961 rate), *and In re Riebesell*, 586 F.3d at 794-95 (same), *with*

9    *Andrews v. Triple R Distrib., LLC*, No. CV 4:12-00346-TUC-RCC (HCE), 2013 WL

10   1177834, at *6, 2013 U.S. Dist. LEXIS 39480, at *15 (D. Ariz. Feb. 28, 2013) (holding

11   agreed rate sufficient).

12   The parties' contract states, "Payments due and unpaid under the Contract shall

13   bear interest from the date payment is due at the rate stated below, or in the absence

14   thereof, at the legal rate prevailing from time to time at the place where the Project is

15   located."  (Doc. 131-1 at 5.)  The parties inserted no specific rate in the space provided.

16   This contractual language adopts the Arizona legal rate of 10% for prejudgment interest

17   on liquidated obligations with no agreed rate.

18   In a supplemental reply brief on remand, Design Trend asserts for the first time

19   that the Arizona postjudgment interest rate at 4.25% may also apply "beyond" the time of

20   a final judgment.  (Doc. 131 at 2 n.2.)  But "arguments made in passing and inadequately

21   briefed are waived."  *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213,

22   1230 (9th Cir. 2008).  This court need not decide this issue, to which Design Trend has

23   given scant attention and on which courts are divided.  *See Latour v. Citigroup Global*

24   *Mkts., Inc.*, NO. 11cv1167-LAB (RBB), 2012 WL 909319, at *1, 2012 U.S. Dist. LEXIS

25   35976, at *4 (S.D. Cal. Mar. 16, 2012) ("deem[ing] any arguments arising from the

26   application of state law standards waived" under the *Halicki Films* standard).

27

28

- 12 -

Accordingly, postjudgment interest will be awarded at the federal rate, now 0.25% per annum, until paid.  "[T]he accrued prejudgment interest is included in the total award that is subject to postjudgment interest" at that rate.  20A James Wm. Moore et al., Moore's Federal Practice § 337.15 (3d ed. 2014); *see also Air Separation, Inc. v. Underwriters at Lloyd's of London,* 45 F.3d 288, 291 (9th Cir. 1994).

## III.   THE PREJUDGMENT INTEREST RATE CONTINUES UNTIL ENTRY OF FINAL JUDGMENT ON REMAND

The parties dispute whether the court should enter "a new, final judgment" (Doc. 131 at 6) or merely "modify or amend" (Doc. 130 at 5) the judgment previously entered on March 6, 2012.  A new judgment must be entered for Design Trend to collect the principal, interest, and attorneys' fees to which it is entitled following remand, as 75% of the previous judgment—attorneys' fees and interest—was reversed and remanded. Whether the new judgment is cast as a replacement judgment or as a revision of the prior judgment, the real disagreement is over the date on which accumulation of interest at the prejudgment rate ceases and the postjudgment rate begins, as the rate is higher for the first.  Cathay believes March 6, 2012, is the proper date; Design Trend says it is the date of judgment on remand pursuant to this order.  The form of the judgment has some bearing on the dispute but is not conclusive.

Cathay cites to *Planned Parenthood of the Columbia/Willamette Inc. v. American Coalition of Life Activists*, 518 F.3d 1013 (9th Cir. 2008), for the point that, following remand, when the "legal and evidentiary basis of an award is . . . preserved, post-judgment interest is ordinarily computed from the date of [the judgment's] initial entry." 518 F.3d at 1018 (alteration in original) (citations and internal quotation marks omitted). It is not apparent how this general principle would apply to the March 6, 2012 judgment. The "legal and evidentiary basis" of Design Trend's award could not be ascertained with certainty until remand, as three-quarters of the original judgment was reversed and remanded.

In any event, it is also true that "determining from which judgment interest should run requires an inquiry into the nature of the initial judgment, the action of the appellate court, the subsequent events upon remand, and the relationship between the first judgment and the modified judgment." *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 702 (9th Cir. 1996) (citations and internal quotation marks omitted). The standard is a flexible one that takes account of a variety of circumstances. Foremost among these is the "equitable purpose behind § 1961 . . . to ensure[] that the plaintiff is further compensated for being deprived of the monetary value of the loss from the date of ascertainment of damages until payment by defendant." *AT&T v. United Computer Sys.*, 98 F.3d 1206, 1209 (9th Cir. 1996) (brackets in original) (citation and internal quotation marks omitted). Where "the prevailing party would be 'further compensated' by calculating postjudgment interest from the date of the prior judgment," that prior judgment should mark the dividing line between pre- and postjudgment interest. *See id.* But where "the postjudgment interest rate is *less* than the prejudgment interest rate, and it is the losing party who asks that postjudgment interest begin at the time of the initial judgment, while the prevailing party seeks to have postjudgment interest run from the date of the later judgment," equitable principles favor the date of the later judgment. *See id.* at 1210-11 (emphasis in original).

In this case, "the award of prejudgment interest under state law" until entry of judgment on remand "more fully compensates [Design Trend] for the loss of use of its money due to the delay occasioned by [Cathay's] actions." *Id.* at 1211. Cathay delayed payment through fourteen years of litigation. "Any other result would penalize the prevailing party, and in certain circumstances might also encourage losing parties to instigate postjudgment litigation so they can reap the benefits of a low interest rate." *Id.*

Even if the court lacked power to find the equitable date for interest on remand, Cathay would be judicially estopped from saying postjudgment interest should run from March 6, 2012. On December 31, 2014, Design Trend moved in the Bankruptcy Court to

release from Cathay's reserve fund the $179,229.15 in damages and costs affirmed in the mandate.  Cathay objected, arguing that "Design Trend does not have a complete and enforceable final judgment" on which to collect.  (Doc. 128-2 at 3.)  That amount was "only part of a potential judgment on remand, the contents and basis of which are presently unknown," Cathay wrote in its opposition brief.  (*Id.* at 4.)  At oral argument, Cathay reiterated that Design Trend "didn't have a final judgment" in this court.  (Doc. 130-1 at 11.)  The Bankruptcy Court agreed and denied release of the funds.  (*See id.* at 11-13.)  Having kept the use of $179,229.15 by claiming there is no final judgment, Cathay may not now say the opposite to avoid paying interest while it had those funds. Judicial estoppel forbids saying something in court to get a benefit after having gotten a different benefit in court by having said the opposite.  *Ah Quin v. Cnty. of Kauai DOT*, 733 F.3d 267, 270 (9th Cir. 2013) ("[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion. [I]ts purpose is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." (alterations in original) (citation and internal quotation marks omitted)).

Prejudgment interest at 10% per annum will continue to the March 16, 2015 date of judgment on remand, with postjudgment interest thereafter on the entire award at the federal rate of 0.25% per annum.

## IV.   ATTORNEYS' FEES

Under Arizona law, in "any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees."  A.R.S. § 12-341.01(A).  "The trial judge . . . has broad discretion in fixing the amount of the fee provided that 'such award may not exceed the amount paid or agreed to be paid.'" *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 570, 694 P.2d 1181, 1184 (1985) (quoting A.R.S. § 12-341.01(B)).  Among the factors to consider are (1) the "merits of the claim or defense presented by the unsuccessful party," (2) whether the "litigation could have been avoided or settled and the successful party's efforts were completely

superfluous in achieving the result," (3) whether "[a]ssessing fees against the unsuccessful party would cause an extreme hardship," (4) whether the "successful party did not prevail with respect to all of the relief sought," (5) "the novelty of the legal question presented," (6) "whether such claim or defense had previously been adjudicated in this jurisdiction," and (7) "whether the award in any particular case would discourage other parties with tenable claims or defenses from litigating or defending legitimate contract issues for fear of incurring liability for substantial amounts of attorney's fees." *Id.*

In "determining reasonable attorneys' fees in commercial litigation," the "beginning point . . . of a reasonable fee is the . . . the actual billing rate which the lawyer charged in the particular matter . . . .  Unlike public-rights litigation . . . in corporate and commercial litigation between fee-paying clients, there is no need to determine the reasonable hourly rate prevailing in the community for similar work because the rate charged by the lawyer to the client is the best indication of what is reasonable under the circumstances of the particular case." *Schweiger v. China Doll Rest., Inc.,* 138 Ariz. 183, 186-88, 673 P.2d 927, 930-32 (Ct. App. 1983).  While the agreed billing rate is not conclusive, there is no showing here that the agreed rates were too high, and the court finds the agreed rates and paid fees to be reasonable.  Accordingly, the remaining considerations as to the amount of the award are four challenged categories of fees.

### A.     Fees Related to Bankruptcy

Cathay contests fees for work done by Jaburg & Wilk, which Design Trend retained in Cathay's bankruptcy case.  It makes two objections: first, that those fees are "unsupported by any fee invoices or alternative task-based itemization"; and second, that fees incurred for the bankruptcy proceeding are unrelated to the contract claim.  (Doc. 115 at 6-7.)

1          **1. Admissibility of the records**

2          Cathay moved to strike Design Trend's Reply (Doc. 116) on the ground that it

3    impermissibly attached Jaburg & Wilk's fee invoices.  The parties were ordered to brief

4    "whether the additional billing records may be added and considered on remand."  (Doc.

5    121 at 1.)  The invoices were emailed to Cathay's counsel prior to Design Trend's filing

6    the original motion for attorneys' fees in 2011, but they were inadvertently left out of the

7    attachments to the fee motion itself.  That oversight does not prejudice Cathay when the

8    invoices were received in fact.  Nor is there any prejudice to Cathay in considering those

9    invoices now, even if they had not been received before.

10         Cathay argues that the Jaburg & Wilk invoices may not be considered because the

11   Court of Appeals' mandate did not direct this court to do so.  (Doc. 125 at 6.)  To the

12   contrary, the mandate expressly authorized "recalculation" of the fee award.  (Doc.113-1

13   at 5.)  "On remand for further proceedings after decision by an appellate court, the trial

14   court must proceed in accordance with the mandate and the law of the case as established

15   on appeal.  The mandate is controlling as to all matters within its compass, but leaves to

16   the district court any issue not expressly or impliedly disposed of on appeal."  *Stevens v.*

17   *F/V Bonnie Doon*, 731 F.2d 1433, 1435 (9th Cir. 1984) (per curiam) (citations omitted).

18         Cathay relies on *Stevens*, which concerned a collision at sea.  The Ninth Circuit

19   had previously "remanded for further proceedings to determine what the costs of repairs

20   were and directed exclusion of repair costs resulting from deterioration."  "On remand the

21   district court held a further hearing on damages and heard expert testimony presented by

22   [the vessel's owner] to establish the cost of repair."  The district court increased the

23   amount of damages proximately caused by the collision.  The defendants contended that

24   holding another hearing exceeded the scope of the remand.  The Ninth Circuit affirmed

25   the new award, holding that because the "mandate . . . did not forbid taking new evidence

26   on the question of damages . . . it was no abuse of discretion for the court . . . to take new

27   evidence on the costs of repairs" instead of basing the newfound cost of repairs "on an

28

1  analysis of its prior award." *Id.* at 1436.  *Stevens* rejects the proposition for which Cathay
2  cites it.  The Jaburg & Wilk invoices are properly considered.

3  ### 2.  Value of fees

4  Cathay argues the Jaburg & Wilk invoices do not establish the reasonableness of
5  the bankruptcy attorneys' fees because "Arizona law prohibits non-task based billing."
6  (Doc. 115 at 6.)  This overstates the law.  Arizona courts are skeptical about "block-
7  billing," that is, a lawyer's "recording of only half-hour or one-hour increments and his
8  practice of grouping tasks together in a block so that time spent on each task cannot be
9  reviewed for its reasonableness."  *See Sleeth v. Sleeth*, 226 Ariz. 171, 178, 244 P.3d
10  1169, 1177 (Ct. App. 2010).  But *Sleeth* ultimately held only that a court should
11  "consider whether each entry of block-billing provides sufficient detail to support an
12  award for that entry." *Id.*

13  Here, Jaburg & Wilk's invoices provide enough detail to conclude that the
14  services were reasonable and compensable.  (*See generally* Doc. 116-2.)  Even in its
15  Supplemental Brief (Doc. 125), filed after Design Trend supplied the Jaburg & Wilk
16  invoices again, Cathay has not challenged any particular entries as lacking sufficient
17  detail.  Instead, Cathay offers only a conclusory allegation that "J&W did not attempt to
18  distinguish or itemize tasks."  (Doc. 125 at 9.)  The Jaburg & Wilk fees are reasonable
19  and will be awarded in the amounts billed.

20  Cathay also challenges Jaburg & Wilk's fees and $15,553.00 in Wilenchik &
21  Bartness fees on the ground they were incurred in bankruptcy proceedings unrelated to
22  the contract action.  Assuming without deciding that a bankruptcy proceeding is not itself
23  a "contested action" for purposes of A.R.S. § 12-341.01(A), this adversary proceeding is,
24  as it was when in state court before it was removed to bankruptcy court.  Nevertheless,
25  "when two claims are so intertwined as to be indistinguishable, a court has discretion to
26  award attorney fees under § 12-341.01 even though the fees attributable to one of the
27  causes of action would not be recoverable under this statute." *Zeagler v. Buckley*, 223

28

Ariz. 37, 39, 219 P.3d 247, 249 (Ct. App. 2009) (citations omitted).  Under this flexible and fact-dependent doctrine, fees may be awarded for work done in bankruptcy where "the bankruptcy proceeding was substantially intertwined with [a] contract dispute."  *Id.* (citation omitted).  For example, when "claims are so interrelated that identical or substantially overlapping discovery would occur, there is no sound reason to deny recovery of such legal fees."  *Id.*

This contract action was "substantially intertwined" with Cathay's bankruptcy proceeding.  Indeed, it was the only reason for the bankruptcy.  Cathay filed the bankruptcy the day before a jury trial on the breach-of-contract claim was set to begin. Design Trend had a majority of the claims, excluding disputed insider claims.  If, as Cathay contended, its principal shareholder had a senior $4 million lien on the hotel, Design Trend would have been left with an empty judgment.  Defeating Cathay's bankruptcy strategy was essential to vindicating Design Trend's contract claim.

Design Trend did avoid Cathay's strategy to divert all the value in its estate to its shareholder.  That resulted in a surplus estate.  All creditors were paid and $750,000.00 was reserved for Design Trend's claim.  Having examined the factual record in detail, the court finds as a fact that the fees Design Trend's attorneys incurred in the Bankruptcy Court were intertwined with and necessary to prosecution of the contract claim against Cathay.  *Cf. Zeagler*, 223 Ariz. at 39, 219 P.3d at 249 ("The trial court [is] in the best position to understand the relationship between the bankruptcy litigation and the contract dispute." (citations omitted)).  Accordingly, the fee award against Cathay will include the $102,785.00 in bankruptcy attorneys' fees.

### B.    Fees Related to Registrar Proceedings

Cathay challenges $1,030.30 in time entries for services in Arizona Registrar of Contractors administrative proceedings.  Design Trend said at oral argument that it did not mean to claim fees for Registrar proceedings, and rather than litigate over the classification of that minor amount, it withdraws that $1,030.30.

1

### C.      Fees Related to Third-Party Claims

Design Trend had pay-when-paid clauses with its subcontractors.  It was sued by subcontractors who were unpaid because Design Trend was unpaid.  In one of those actions, subcontractor Hawkeye sued Cathay, Huang, and Design Trend in Superior Court, prompting Design Trend to file counterclaims and cross-claims.  That case was later consolidated with another action brought against Cathay by a third party and removed to the Bankruptcy Court in September 2004.  Cathay now challenges $7,448.25 in "fees incurred in third-party proceedings," including "fees associated with settlement discussions between [Design Trend] and subcontractor Hawkeye, pleadings by Hawkeye, and/or pleadings between Hawkeye and Cathay."  (Doc. 115 at 11.)

Contrary to Cathay's contention, the holding of *Fulton Homes Corp. v. BBP Concrete*, 214 Ariz. 566, 569, 155 P.3d 1090, 1093 (Ct. App. 2007)—that "the parties must actually be 'adverse'" for fees under § 12-341.01—does not preclude fees directly occasioned by another party in the same action between the directly adverse parties.  The test is whether those fees are "intertwined" with the contest between the contracting parties.  Cathay's wrongful non-payment of Design Trend drew Hawkeye and others into this litigation.  Defending against those additional parties was inextricably intertwined with prosecuting Design Trend's contract claim against Cathay in the same consolidated action.

### D.      Fees Related to Unfiled Papers

Cathay challenges $2,904.50 in fees for drafting papers that Design Trend decided not to file.  There is no automatic exclusion of services for drafting documents not ultimately filed.  Rather, the test is whether the work was reasonable.  Lawyers reasonably explore ideas and strategies that they decide not to pursue.  Sometimes only writing will show whether a paper merits filing.  Sometimes events make the filing unnecessary.  There is no showing that the $2,904.50 for work on papers not filed was unreasonable.

The strategy being investigated was liability of Cathay's principal, Mr. Huang.  In October 2001, Cathay recorded a deed of trust giving Huang a $4 million lien on that hotel.  Cathay and Design Trend were by this time already in a dispute about Cathay's failure to pay Design Trend for work on the hotel.  (*See* Doc. 29 at 2-3.)  Design Trend argued that Cathay's sale of the hotel in bankruptcy was an attempt to "materially advance its sole shareholder's personal interests to the derogation of . . . the interests of creditors."  *In re Cathay Enters., Inc.*, No. 2:04-bk-15766-PHX-RTB, Doc. 124 at 4 (Bankr. D. Ariz. Nov. 9, 2006).  Design Trend withdrew its objection to Cathay's sale of the hotel in November 2006 after Cathay agreed to set aside $750,000 for Design Trend's claims.  *Id.* at 5.  It was reasonable to investigate Huang's liability, which ceased to matter once Cathay agreed to that reserve.

## E.    Review of Discretionary Factors for Awarding Fees

The factors identified in *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 694 P.2d 1181 (1985), confirm this court's discretion in awarding Design Trend its reasonable attorneys' fees.  The "merits of the . . . defense presented by" Cathay proved insubstantial, though costly and time-consuming.  *Id.* at 570, 694 P.2d at 1184. Notwithstanding Design Trend's delay, Cathay repeatedly demanded that Design Trend complete performance, which it did.  By electing completion rather than termination and damages, Cathay waived Design Trend's breach as a basis to refuse payment.  These facts did not present a "novel[] … legal question."  The claims and defenses had "previously been adjudicated in this jurisdiction" under well-settled principles of Arizona construction law.  Awarding Design Trend its fees will not "discourage other parties with tenable . . . defenses from . . . defending legitimate contract issues for fear of incurring liability for substantial amounts of attorney's fees."  Design Trend prevailed on most of its claims except some offsets.  "Assessing fees against the unsuccessful party" will not "cause an extreme hardship."  The funds to pay the award are in Cathay's estate.

The strongest consideration in this case is whether the "litigation could have been avoided or settled and the successful party's efforts were completely superfluous in achieving the result." *Id.* Cathay has fought with determination for fourteen years to avoid paying for work done. Indeed, this claim could have been adjudicated and quantified in the Superior Court trial in 2004, had Cathay filed its bankruptcy after the verdict rather than the day before the trial. It then could have had all the protections of bankruptcy concerning management and liquidation of its asset, the hotel. Cathay's unrelenting defense made this litigation unavoidable and increased the expense greatly.

The circumstances of this case powerfully satisfy the court's discretion to award fees "to mitigate the burden of the expense of litigation to establish a just claim or a just defense." A.R.S. § 12-341.01(B). Failure to award fees would leave Design Trend better off had it never come to court. It would reward the strategy of multiplying proceedings to make meritorious litigation futile.

Design Trend will be awarded $381,936.14 in attorneys' fees, including attorneys' non-taxable expenses, which are customarily and reasonably listed separately from the hourly rate value of professional services. Attorneys' fees incurred on remand may be claimed pursuant to Rule 54(d)(2), Federal Rules of Civil Procedure, and Local Rule 54.2.

IT IS THEREFORE ORDERED that Design Trend's Amended Motion for Entry of Final Judgment (Doc. 114) is granted in the amounts stated below.

IT IS FURTHER ORDERED that the Clerk vacate the Judgment (Doc. 93) entered March 6, 2012, and enter judgment pursuant to mandate and to this order in favor of Design Trend International Interiors, Ltd., against Cathay Enterprises, Inc., for:

/ / /

/ / /

(1)     $169,025.22 in damages,

(2)     $199,218.22 in prejudgment interest thereon at the rate of 10% per annum from June 5, 2003, until March 16, 2015,

(3)     $381,936.14 in attorneys' fees,

(4)     $10,203.93 in taxable costs, and

(5)     postjudgment interest on those amounts, which total $760,383.51, at the federal rate of 0.25% per annum from March 16, 2015, until paid.

The Clerk shall terminate this case.

Dated: March 16, 2015.

_____
Neil V. Wake
United States District Judge